Good morning, Your Honors. Good morning. If it pleases the Court, my name is Gerald Sherald and I represent the petitioner, the appellant in this case, Mr. Margain. We are here on two issues on appeal, I believe. The first issue being whether the District Court erred in finding that the habitual residence of the child at issue had not been abandoned in the United States when the child moved from San Diego to Hermosillo, Mexico on October 11, 2010 and remained there continuously until at least July or August of 2012. We believe that the trial court erred in several respects with regard to the consideration of the evidence and we believe it's instructive that the case of Moses v. Moses indicates that the primary concern of the Court in addressing this issue should be the intent of the parents. Where the intent of the parents is not apparent from the record, the Court must look at all of the evidence available, not just selected pieces of evidence. We believe that the record clearly supports from the date of the child's relocation on October 11 forward that both parents acquiesced in this child's residing permanently in Hermosillo until mother, and we believe surreptitiously, removed the child to Tucson, Arizona, where the parties had never resided. Your difficulty here, obviously, is overcoming our standard of view, which is what? The standard of view, Your Honor, is a mixed question of law and fact. The Court looks for a factual errors, abuse of discretion on factual errors, but the ultimate issue of habitual residence is an issue for this Court to determine de novo. Well, that's true, but there's a heavy factual determinations underlying this, and in particular, there was an adverse credibility determination against your client. There was, Your Honor, but I believe for the wrong reasons, and I believe that the Court ignored the very admitted testimony of mother that, in fact, the parties agreed that the child would reside in Hermosillo from October 11, 2010 forward. The Court's order, the Court's ruling was that there was no evidence in the record that either parent agreed that the child would reside and live in Hermosillo, Mexico. That's simply contrary to the record and mother's own admission. There was one email that said something like that. That is correct. January 27th, it's in the record, Your Honor, that states that mother admits that with father's consent, mother and the child went to live in Mexico, which is contrary to any email that she had, or I'm sorry, contrary to any evidence that she submitted earlier that says, oh, I was just here for a two-week vacation. Let's assume those facts to be true at the time that she moved. All of her actions thereafter clearly support a finding that, in fact, the child's habitual residence was changed to Hermosillo. By example, Your Honor, the child went to a private school in Hermosillo. Dad paid all the cost for that. Dad's access to the child at all times was Hermosillo and in Mexico from the time the child relocated until August of 2012. And I pointed out in my brief that there was also a divorce case filed that the Court simply chose not to give any credibility to, and specifically the order that mom not remove that child from Hermosillo until such time as she obtained a court order. Mom clearly did not get a court order and moved the child back to Tucson without informing father of her intent to do so. Under Holder v. Holder, Your Honor, there are also seven specific factors that the Court encourages the trial judge to look at with regard to whether a habitual residence has been established. I'd also point out that if there is, as a preliminary matter, if there is an indefinite stay in a particular location, and in this case it was almost 18 months, if there's an indefinite stay, then it points to an abandonment of the prior habitual residence in favor of the new one, which in this case would be Hermosillo, Mexico. With regard to the factors the Court looks at, the first one is intent. And I believe that, as I stated before, the various emails starting within two weeks of mother's relocation, where she asked father to send some of the child, actually thanked father for sending some of the child's clothing so that the child would have adequate clothing and toys in Hermosillo. Mother also, in December of 2010, indicated that she intended to come back to San Diego on a periodic basis to perform dental work, but did not indicate whatsoever that she ever intended to relocate permanently back to San Diego. We also believe that the mother traveled to Arizona on numerous occasions, as indicated by her own witnesses, but my client was never informed of that. With regard to the second element, it's time involved in a particular location, as stated before, 18 months is a substantial period of time, and that fact alone should have been a factor that the Court looked at in determining habitual residence. The Court's order, or the Court's ruling, was that mother was forced to reside in Hermosillo because she had no the contrary. Mother retained very expensive lawyers in Hermosillo to represent her in her divorce proceedings in Mexico. She received child support from father under the Tijuana divorce proceedings. How far into the timing was that, into the 18 months? The Tijuana case was filed in August, I believe, of 2011, so 10 months after mom had relocated. I thought that she testified that there was, in fact, no money put in the bank. I'm sorry? I thought she testified that when she went to collect the money from the bank, it wasn't there. My client was able to establish that she collected at least, I think it was $3,400, from the divorce proceedings. But she said at another point she went there was no money. I'm sorry? I thought she said when she went there was no money, and also, I mean, everything that you're talking about was disputed. That's the problem. You had a fact just before that, and what was the other fact that you just mentioned? It got expensive, William. Oh, right. Where is there any evidence how expensive they were? Well, I don't have on the record how expensive they were. We just know that she was able to hire lawyers. Everything's disputed. What is not disputed is mom's own admission, Your Honor, that in January 27th of 2011, she sends an email to dad stating specifically that he had consented to the parties that mom and the child permanently relocating to Hermosillo. Well, where is that in the record, by the way? Oh, Your Honor? You know, I mean, it was part of her testimony, and I did read it, but I'm now having trouble finding it. It's under CR 37 ER 41, lines 19 through 25, Your Honor. Is that under testimony, or is there? That was under testimony, Your Honor. That's correct. His testimony? I'm sorry. Yes, it was testimony about the email mom sent dad on January 27th, 2011. And I pointed the email out to mom, and she testified that, in fact, that was her statement. You say it's on ER 41? Yes, Your Honor. Lines 19 through 25. Are you going to discuss the other major issue, the one-year issue? I am, Your Honor. To complete my argument on the issue of whether the habitual residence of the child was Hermosillo as opposed to the United States, Your Honor, the court also should look at the issue of medical care for the child, which was all done in Hermosillo for that period of time, the issue of schooling. You see, the basic issue is, right under the case law, whether the parties, the husband and the wife, had the shared intent to abandon the U.S. domicile, right? I absolutely agree with you. And what you argued is certain actions that the wife took, but it doesn't go to a shared intent, does it? I believe that the email clearly shows shared intent when mother writes dad and says, by your consent, we moved to Hermosillo, Mexico, which would imply that dad would say, mom, you want to go to Hermosillo? And I agree. So there had to be a shared intent. Otherwise, there would be no basis for that statement. Even if the court were to find no shared intent, the court then must look to all of the evidence. Yes, but that's a shared, maybe an intent to move to Hermosillo, but that's not a shared intent to abandon the child's domicile. In other words, she said, didn't she, in one of those emails, well, I agree to go to Hermosillo for security reasons. Isn't that what she said? No, Your Honor, I believe that was her testimony. It wasn't an email. Well, it's her testimony. She said, I agree to go to Hermosillo for security reasons. That doesn't necessarily mean I intend to go to live there permanently. Except for the fact that there were no security issues in Hermosillo, and she admitted that. But she admitted that. No, but she said that, and why isn't the court permitted to credit that? The court's entitled to credit it, Your Honor, but at some point, the court must make a determination as to whether there's an abandonment of her original domicile in the United States. You're supposed to make that determination. I'm sorry? There wasn't. Even if, as the court suggests, that there wasn't a shared intent, then I believe the court's obligation is to look at the indefinite state provisions under Robert v. Tessin and falls versus. Which is one factor. That is one factor. That's correct. But when you look at all of those factors, Your Honor, the schooling, the medical care, the child's extended family, they were all in Hermosillo. None of them were in the United States. Absolutely none. So we believe that the court erred with regard to its finding when you look at all of the discrete evidence, as this court, as the appellate court is required to do, in finding that the habitual residence of the child had not been abandoned. In addition to the fact that there is at least one case that states that it is evidence or is something to consider that a court of a country had entered an order stating that mom was not to remove that child from Hermosillo without a court order. She did so not only in violation of the order but without informing either the court or father. Now to the second issue the court's requesting that I address, Your Honor. That's the issue of even assuming that the child had been, that the habitual residence was in fact in Hermosillo. Whether the court erred in finding that the child shouldn't be returned because the petition was filed more than one year after the removal, which that's problematic for ICE and I admit it because mom indicates that she moved July 5th. The problem for mom is that the dad didn't know that. We believe that dad proved substantially that all of the efforts he made to locate When did he know, what's the evidence of when he knew in your view? Well, first of all if mother actively concealed the child, that's a defense. When did he know that she moved up here to Tucson? We found, my client found out we believe in latter part of, in the first part of June. He hired an investigator in May of 2013 I believe it was after he had met mother in Tucson under the guise of mother claiming that she had gotten a hotel there and that as a result she was going to allow dad access to the child. Not only did she not get a hotel, Now that was almost a year after the wife claimed she moved, right? That is correct. What did he do in the 10, 11 months before that? In the 11 months prior to that, Your Honor, he took substantial efforts to gain access to his daughter as indicated by the record. He had affidavits of his attempt to access the child. He was told by individuals at the residence that the child was simply not available. After so many efforts were made, Your Honor, he then obtained an order modifying custody in the divorce case in Tijuana. Mother never provided the court with any change of address. Once he obtained that custody order, But what is the relevance of all this after the Lozano case? I'm sorry? What is the relevance of all this after the Lozano case? I believe it simply goes, The court had asked what efforts my client had made to I understand it, but I want to know what the relevance of it is. But that goes to your contention that maybe the start of the one-year period should be told because the wife was hiding the child from the husband, right? That's correct, because there was active That's your position. That is absolutely my position, that there was active concealment of the child. So what's the relevance of it? I'm sorry, I didn't hear you. It can't be told. Oh, I'm sorry. Well, there was case law, and I guess I'm not familiar if there's a brand-new case that's standing again. There's a Supreme Court case which said it can't be told. So it can't be told. If you don't know that, then you shouldn't be standing up here. But if it can't be told, what I was trying to establish or understand, he did know before the one-year expired, correct? Although not long before. He did. Okay. So I admit that that second element is problematic for us. So what can we do on that? Then you have to look at the evidence on the acclimation, so to speak. Agreed. Is there... The firm resettlement. Firm resettlement that you think that the district court erred in as a part of his decision that you think is wrong, either factually or legally on that point? Well, as pointed out in the record, Your Honor, on appeal, that the mother's own expert didn't indicate that the child had actually been well-settled, but somewhat acclimated to the current environment. And we don't believe that that meets the burden of proof under the proponents of evidence that mothers establish that. So the burden was on mother. She didn't establish it. And yet the court indicated that the child was, in fact, well-settled. Do you want to reserve your time? I do. Thank you. Thank you. You may proceed. Thank you. Good morning. My name is Roberto Montiel, and I represent the respondent, Elsa Ruiz Burst. Just to cover one thing that was covered by the court towards the latter part, there is, in fact, no tolling of a treaty under Lozano and Montoya. That's a Supreme Court case. So that issue is really not before the court. What this court is here to decide is whether Judge Rainer Collins committed clear error when he made his factual findings that the child had not been removed from her habitual residence. In order for this court to find clear error, you must determine that Chief Judge Collins committed clear error when he determined that the child, at the time that she was taken from Hermosillo to Tucson to live, that she was or had abandoned her habitual residence in the United States. Up to October, October 11th of, up to October of 2011, this child had lived in the United States. And it was only when the father decided to break up the home that the problems developed. On that date in October, the father and the mother decided that the child would go with her mother to visit the grandparents in Hermosillo. Once she got there, a week or two weeks after that, she receives a call from her husband saying... All right, this is all her testimony. Obviously, this is all very contested, right? About what happened. So we know what her story is. We know what his story is. The question is whether Judge Collins... But there was, in fact, and I'm having trouble finding it, at least one email where she did say something like, we agreed that I would come here to Hermosillo with the child and stay here. There was something to that effect. He says that's the January 27 email. Yes, there was an email, but that was after the call had been received from her husband telling her, I'm selling the home in Coronado and I'm moving to Tijuana. You no longer have a home here. It was right after that that she sends that email and she admits during her testimony that she was angry because all of a sudden everything that she had the rug had been pulled out of her. At that time, she did some things that were consistent with the idea that she had no intent of ever leaving the United States as the habitual resident. What she did, she says, well, I'm going to put this child in school here in Hermosillo in an English speaking school because that was our agreement. And as soon as I am able to, I'm going to move back into the United States. And as soon as she was able to, not through her own resources, but through her father's resources... But Judge Collins said there was no evidence that she intended that they mutually agreed to take the child there and stay there and there was at least some evidence. That there was no agreement? Yes. There was some evidence i.e. at least this one email which seems to address the point directly. Well, there was evidence to establish that Mama always intended to go back to the United States. I wasn't saying that. I wish I could find the actual email but it said quite specifically as I recall that we decided together that I would come here with the child and we would live here. I don't believe that that's what that email says. I'm talking about the one in January not the ones in October. Okay. So whether or not whatever the story was in October by January that seemed to be what she was saying. By January the child was in school in Mexico in an American school. I thought she wasn't in school until February. February the next year. Right. But this was January. Yes. Okay. And the child in fact went to school in an American school. And as soon as that lady was able What does that prove? Well a school that spoke only English. Oh, so the woman she was an American citizen her daughter was an American citizen she might well want her to speak English that doesn't prove anything about where she was going to raise the child. Well except we have to look back as to the original intent of the parties and that was that this child prior to their marriage after their marriage conversations between husband and wife conversations between grandfather and father conversations between friends conversations between sisters was always that this child was going to be raised in the United States and the reason the child would be raised in the United States was was because they wanted her to have the education they wanted her to have the protection of the United States  to have the protection of the United States there's some history in the father's family that it was a very violent history while they lived in Tijuana one of the brothers was actually killed in Mexico City and the father had told the mother my daughter is always going to be raised in the United States because I don't want for her to have that kind of life he he lives in Tijuana and he did at that time but he would travel on a daily basis to Coronado and that's where he made his home so there was always an intent that this child would be a United States citizen because that was the intent of the parents and there's no evidence that that ever changed there was a she went back I recall and maybe it was around the time of this email she did go back to Coronado or California to see if she could afford to live there in about January in January of 2011 right and she couldn't afford to live there and she went with her grandfather with her father because her father was going to help her with the money that was necessary to live there but she also found one very interesting thing that already the home where they had lived was already someone else was living in that home she believes it was some friend of her husband and what's the relevance of that the relevance is that she had nowhere else to go to in California she had to stay in Hermosillo until such time as she had the capability to be able to raise the child as they had both agreed that she would be a U.S. citizen and would be raised as a U.S. citizen she would become an American as we are we don't have to reach any of this is that right we don't have to reach any of this if we conclude that the petition wasn't filed until more than a year after and the child was well settled that's true none of this has to be reached that's an alternative to substantiate or verify what Judge Collins did because it took more than a year for him to file it and there is no tolling equitable tolling of the statute and Judge Collins did find that the child was in fact acclimated she has superior grades she has a superior intellect she has friends there she goes to school there the mother is acclimated and the child and the mother have a very good relationship so that alone should preclude this court from overruling what Judge Collins has done and I don't think there is anything in the record at least that I have been able to find where Judge Collins made a decision with regard to the facts that is not well verified by the facts now there may be some facts that are contradictory and the court may have thought that perhaps he should have gone the other way but that's not the prerogative of this court deference must be given to Judge Collins if what he did is supported by the court let me ask you just as a matter of background you or somebody else started divorce proceedings in Santa Cruz County I did sir you did that case was pending right yes sir do you want a little bit of the history of what's gone on just tell me what stage you are in that case that case was dismissed in Santa Cruz County it was appealed to the court of appeals division two division two has now remanded it back to the trial court to do some procedural matters that she neglected to do so it's now sitting before the trial judge and at this point I think she has ordered us to file additional memoranda and it's going to be treated as a summary judgment you expect that case to be disposed of on the merits I hope so judge now we understand also that the husband has a divorce proceeding pending in Mexico I think Tijuana right do you understand that yes sir alright now has the wife appeared in that proceeding did she appear in that proceeding initially she appeared there was her lawyers withdrew and we have some issue with regard to notice that wasn't given to her so we very much believe that we're going to be able to establish to the court in Tucson that the order that was entered in Tijuana was without jurisdiction now has the husband appeared in the Arizona case yes sir he has so both cases are ongoing yes sir as is this one that's what I'm interested in thank you so this is an unusual case because well maybe not the father is seeking to have the child physically returned to Tijuana right for the purpose of determining the custody and divorce proceedings in Mexico right so this is what confuses me if the your concern I gather is with having the proceedings here instead of in Mexico is that not right I would prefer the proceedings here than in Mexico but if the courts here decide that Mexico had jurisdiction then whatever goes on in this proceeding i.e. in the hate convention proceeding isn't going to matter anyway I'm not in a position to really answer I don't know what's going to happen but I do know that we believe very strongly that the court in Tijuana did not have jurisdiction and that's what we intend to prove in about two weeks now in the court here in Tucson the purpose of this hearing   whether the child was wrongfully removed and where the habitual residence is for purposes of determining further proceedings right I mean that all we are determining is whether what is the state convention that's all the further it goes I'm not sure but if what's complicated about this is that ordinarily that means that a provides jurisdiction in a court that might not have jurisdiction but this child is in the United States now unless until the father gets her back to Mexico  there have been a couple years of litigation here that didn't succeed in establishing her custody differently from what was the outcome of the custody I'm not sure judge we of course are not the people that brought this to the federal court for these proceedings there were proceedings in Arizona there were proceedings in Baja California and all of a sudden we get hit with this proceeding and we're going to have a case in Tucson where they're trying to enforce the action in Tijuana with the petition for dissolution in Arizona Nogales Arizona because what's going to have to be determined in both of those cases is whether or not the court in Tijuana had jurisdiction to enter the order but then all the Hague Convention does is really deal with the physical presence of the child and for example if we or Judge Collins had determined that the child was wrongfully removed if we determined that then the child would be there would be an order to return the child to Mexico if the child were wrongfully removed if the child is not wrongfully removed the child would not be taken back to Mexico for custody proceedings end of story for the federal court because then you still have international jurisdiction issues and prominence and deference and a lot of the other international concepts but our duty is done to say yes or no this child was wrongfully removed do you agree with that and we have nothing to do with what ultimately will be the custody provisions for the child because that's not what the hate convention does that's my understanding your honor any other questions thank you so much you have some rebuttal time not much but we're going to give you some real rebuttal time you can have a minute or two I appreciate it if you prevail in this proceeding I'm sorry if you prevail in this proceeding what you will get is an order that the child can be brought back to Mexico that doesn't mean that the father gets custody it means the mother can bring the child back to Mexico that is correct and meanwhile the Mexico proceedings and Nugali proceedings are still going to do whatever they do I would like to say that the trial court originally granted that's what  up on appeal and it's back for the trial court to make other procedural rulings which it didn't do at the time it dismissed ultimately our goal is to obtain a valid order of custody which we believe we already have out of the Tijuana court for dad's sole custody of the child because the child's home state as opposed to habitual residence was Mexico because the child had continuously moved there's still a question of whether the Tijuana decree is valid then the child would   to Mexico under the decree of Mexico anyway as opposed to simply removing the Tijuana decree from the court of the United States under judge Collins order until a competent court issues a custody order and I agree with your honor this court doesn't have anything to do with custody and really in fact we need to issue our decision and then it will take its course with the physical presence of the child thank you these are always very difficult and unfortunate circumstances on all sides when these come before the court but obviously we need to hear these   hate convention the case just argued Margan versus Reese Boris is submitted thank you thank you thank you thank          thank you thank thank you thank you thank thank you thank you thank you thank you thank you thank
judges: Tashima, McKeown, Berzon